FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ JAN 10, 2017 ★
Rec'd 1/10/17
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

SAIAT STEPANIAN,

                          Plaintiff,         15 CV 3727 (SJ) (JO)

  - against -                           DECISION
                                              AND ORDER

UNITED STATES OF AMERICA,

                          Defendant.
-----------------------------------------------------------------X

A P P E A R A N C E S:

NICHOLAS W. KOWALCHYN
8010 13th Ave.
Brooklyn, NY 11228
Attorney for Plaintiff

ROBERT L. CAPERS
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201
By:   Seth Eichenholtz
       Matthew Silverman

JOHNSON, Senior District Judge:

## INTRODUCTION

Saiat Stepanian ("Plaintiff") filed this lawsuit on June 25, 2015 under the

Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671 et seq. Plaintiff

1

claims that on or about June 27, 2013, the Gateway National Recreation Area ("GNRA") maintained a dangerous and unsafe condition on its roadways, consisting of unmarked, unilluminated and unsigned roadway barriers. (See Complaint ¶ 6.) The GNRA is owned and operated by the National Parks Service ("NPS"), a division of the Department of the Interior. (See Complaint ¶¶ 3-5; Answer to Complaint ¶¶ 3-5.) Plaintiff alleges that while he was riding his motorcycle within the GNRA, he collided with roadway barriers and sustained serious and permanent injuries. (See Complaint ¶ 7.) He seeks damages in the amount of $2 million.

The parties moved to bifurcate the liability and damages portions of the case. (See Docket Numbers ("Dkt. Nos.") 16, 20; Minute Entry dated 4/8/2016.) At the bench trial held on October 6, 2016, the Court received evidence concerning Plaintiff's claims regarding liability. Plaintiff, and Maxim Rubenchik, his friend, testified. The Government called Officer Nelson Gomez, a NPS police officer. (See Trial Transcript dated 10/6/2016 ("Tr.") p. 157.) Based on the observations made during testimony, the Court found Mr. Gomez's testimony credible; Mr. Rubenchik's testimony largely credible; and Plaintiff's testimony largely not credible. On the basis of evidence and stipulations of fact to which the parties agreed, the Court makes the findings of fact and reaches the conclusions of law set forth below.

2

## FINDINGS OF FACT

Plaintiff Saiat Stepanian

1. Plaintiff Saiat Stepanian has been licensed to ride a motorcycle by the State of New York for 15 years. At the time of the accident, he was 36 years old. (Tr. 9, 11.)

2. On the day of the accident, June 27, 2013, Plaintiff drove a Honda 2012 CRV 1000. (Tr. 70.)

3. The headlights of Plaintiff's motorcycle illuminate approximately 60 feet in front of the motorcycle. (Tr. 70.)

4. Plaintiff purchased the motorcycle on June 22, 2013, five days before the accident at issue. (Tr. 65.)

Before the Accident

5. On June 27, 2013, Plaintiff and his friend, Maxim Rubenchik, met up at approximately 9:00 p.m. to ride their motorcycles together. (Tr. 63.)

6. While they were riding on the Belt Parkway, in Brooklyn, NY, at approximately 10:00 p.m., it started to rain. (Tr. 63; Joint Pre-Trial Order, Stipulation of Fact ("Stip. Fact") K.)

P-049

7. Plaintiff and Mr. Rubenchik entered Floyd Bennet Field ("the park" or "FBF"), a defunct airport within the GNRA, to seek shelter. (Tr. 30, 31, 75, 78; Stip. Fact L.)

8. Plaintiff had ridden a motorcycle in the park in the past. (Tr. 56-57, 59.)

9. Plaintiff was aware that the sign at the main entrance of the park states that the park closes at dark. He was also aware that orange barricades are used to block-off certain areas from vehicular traffic. (Tr. 56, 59.)

10. When Plaintiff and Mr. Rubenchik arrived at the park, they waited for the rain to stop underneath an awning at the Aviator Sports Center ("the sports center"), for approximately ten to fifteen minutes. (Tr. 31.)

11. After it stopped raining, Plaintiff and Mr. Rubenchik decided to ride their motorcycles around the park. (Tr. 31, 32.)

12. It was dark and the pavement was wet from the rain. (Tr. 32, 33, 34, 61, 111.)

13. They rode their motorcycles from the sports center, on the Old 6-24 Road (also known as Hangar B Road), turning left and driving toward Raptor Point. (Tr. 33, 35-38, 106, 107; Gov. Ex. N.)

14. They rode past orange barriers and "Do Not Enter" signs near the intersection of Old 6-24 Road and two runways. (Tr. 35-38, 126-128; Gov. Exs. A, D1-D8, E1-E7, K, N.)

15. When they reached the Raptor Point area, they continued on a small road toward the Remote Control Flying Field. (Tr. 37, 38, 107; Gov. Ex. N.)

P-049

16. When they reached the Remote Control Flying Field, they turned left, passing "No Left Turn" and "One Way" signs and entered the North 40 Runway. (Tr. 38, 107-108, 128-129; Gov. Exs. K, N.)

17. This is the only way to enter North 40 Runway, which is otherwise blocked off by orange barricades. (Tr. 136; Gov. Ex. N.)

The Orange Barricades

18. At the time of Plaintiff's accident, interconnected orange barriers were positioned across the runway, "to close off the runway." (Tr. 128)

19. These barricades close off the portion of the runway that leads to Raptor Point. (Tr. 136; Gov. Exs. M, N.)

20. The barricades are orange, interconnected, contain "Do Not Enter" signs and are visible from 200 feet away at night. (Tr. 125-126, 128, 133.)

21. These barriers have been in place for at least seven to eight years. (Tr. 129.)

22. NPS employees make decisions about the placement of these barriers, based on events, accidents, or maintenance purposes. (Tr. 130.)

The Accident

23. After doing some runs together on Runway North 40, from the Remote Control Flying Field towards Flatbush Avenue, Plaintiff decided to go on a "solitary run," a ride alone. (Tr. 38, 64; Gov. Ex. N.)

24. Mr. Rubenchik waited for Plaintiff at the beginning of the North 40 Runway, near Cricket Field. (Tr. 42; Gov. Ex. N.)

25. Plaintiff drove straight on North 40 Runway, towards Raptor Point. (Tr. 41, 112.)

26. While Plaintiff was driving, he looked down at his speedometer, and when he looked up, he saw the orange barricades in the distance. (Tr. 67.)

27. Plaintiff was unable to slow down or stop because he did not have enough time apply the brakes. (Tr. 69.)

28. Plaintiff collided with the orange barriers blocking the runway. (Tr. 43, 64, 65; Stip. Fact P.)

The National Park Service

29. The maintenance department of NPS has the responsibility of positioning and designing the barriers at issue. (Tr. 129-130.)

30. Signage and other safety designs of the park are a discretionary function of NPS, as provided under 16 U.S.C. §1. (Stip. Fact H.)

**DISCUSSION**

I. Subject Matter Jurisdiction.

In general, the United States is immune from suit, unless it consents to be sued through a waiver of sovereign immunity. See F.A.A. v. Cooper, 132 S. Ct. 1441,

1456 (2012). The FTCA acts as a waiver of sovereign immunity for tort claims arising out of negligent conduct of government employees acting within the scope of their employment. See 28 U.S.C. §§ 1346(b), 2671 et seq. Thus, the government can be sued "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §1346(b)(1).

However, the FTCA also includes exceptions to its waiver of sovereign immunity, including the "discretionary function exception" which immunizes the government from suit for any "claim based... upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). In claims involving the FTCA, the plaintiff bears the burden of showing, by a preponderance of the evidence, that the court retains jurisdiction; specifically, that the challenged action of the National Park Service was "controlled by mandatory statues or regulations." United States v. Gaubert, 499 U.S. 315, 328 (1991); Yesina v. United States, 911 F. Supp. 2d 217, 220 (E.D.N.Y. 2012); Fraser v. United States, 490 F. Supp. 2d 302, 307 (E.D.N.Y. 2007). Because the FTCA creates a waiver of sovereign immunity, it is strictly construed and all ambiguities are resolved in favor of the United States. Fraser, 490 F. Supp. 2d at 309 (citing Moreno v. United States, 965 F. Supp. 521, 524 (S.D.N.Y. 1997)).

P-049

### a. The Discretionary Function Exception.

"The discretionary function exception is 'a form of retained sovereign immunity. As a result, the [FTCA's] waiver of federal sovereign immunity does not encompass actions based upon the performance of, or failure to perform, discretionary functions.'" Reichhart v. United States, 408 Fed. Appx. 441, 443 (2d Cir. 2011) (quoting In re World Trade Ctr. Disaster Site Litig., 521 F.3d 169, 190 (2d Cir. 2008). "Because the FTCA is structured as a grant of subject matter jurisdiction to the federal courts, a finding that the discretionary function exception applies is tantamount to holding that the court lacks jurisdiction." Caban v. United States, 671 F. 2d 1230, 1235 n.5 (2d Cir. 1982) (citation omitted).

The Supreme Court in Berkovitz v. United States, 486 U.S. 531 (1988) established a two-part analysis to determine when the discretionary function exception applies. First, the Court must determine whether the action at issue involved an "element of judgment or choice." See Gaubert, 499 U.S. at 322. The "nature of the conduct, rather than the status of the actor" must be considered. The discretionary element is not met where a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." Berkovitz, 486 U.S. at 536. If a regulation prescribes particular action, the analysis ends here as an employee "has no rightful option but to adhere to the directive." Id.

If no such directive exists, then a discretionary choice likely does, and the

P-049

Court must then consider "whether that judgment is of the kind that the discretionary function exception was designed to shield," specifically, "governmental actions and decisions based on considerations of public policy." Id. at 536-537. This part of the inquiry focuses "on the nature of the actions taken and on whether they are susceptible to policy analysis." See Gaubert, 499 U.S. at 325; see also Shansky v. United States, 164 F. 3d 688, 691 (1st Cir. 1999) (citations omitted). The Supreme Court has held, "[w]hen established governmental policy, as expressed or implied by... agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." See Gaubert 499 U.S. at 324.

      i.      <u>Step One: The Discretionary Function Exception Applies.</u>

Here, the Government argues that the government employees' conduct at issue - the signage, lighting and placement of the roadway barriers – are discretionary. It asserts that Congress explicitly granted discretion to NPS in 16 U.S.C. §1, which requires NPS to "promote and regulate the use of Federal areas known as national parks" in such a manner as "to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment in the same manner and by such means as will leave them unimpaired for the enjoyment of

future generations." 16 U.S.C. §1[1] The Government also cites the NPS Management Policies ("NPS Policies")[2] to show that the decisions of whether and where to place barriers, lighting, and signage on the roadways was a matter of choice. Section 8.2.5.1 of NPS Policies, entitled "Visitor Safety," states:

> The Service recognizes that the park resources it protects are not only visitor attractions, but that they may also be potentially hazardous. In addition, the recreational activities of some visitors may be of especially high-risk, high-adventure types, which pose a significant personal risk to participants and which the Service cannot totally control. Park visitors must assume a substantial degree of risk and responsibility for their own safety when visiting areas that are managed and maintained as natural, cultural, or recreational environments.
>
> These management policies do not impose park-specific safety prescriptions. <u>The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing</u>. Examples include decisions about whether to install warning signs or artificial lighting… [and] close roads and trails…

NPS Policies § 8.2.5.1 (emphasis added). "Clearly, [t]he plain language of § 8.2.5.1 grants considerable discretion to NPS officials to determine the best way to utilize park resources to ensure public safety." Brown v. U.S. 661 F. Supp. 2d 341, 362 (E.D.N.Y. 2009).

The Government also relies upon the testimony of Officer Nelson Gomez, the NPS Police Officer who was dispatched to the accident. (Tr. 133-134.). Mr.

---

[1] 16 U.S.C. §1 was in effect at the time of this accident, on June 27, 2013, however, it was repealed on December 19, 2014, and now has provisions contained in a Revised Title. See 54 U.S.C. §§ 100101, 100301 to 100303, 100751 to 100753, 102101.
[2] Available at: https://www.nps.gov/policy/MP2006.pdf (last accessed 29 Nov. 2016).

10

P-049

Gomez testified that the maintenance department of NPS has the responsibility of positioning and designing the barriers at issue. (Tr. 129-130.) At the time of Plaintiff's accident, interconnected orange barriers, with "Do not Enter" signs were positioned across the runway, "to close off the runway." (Tr. 128, 130) The barriers had been in place for at least seven to eight years. (Tr. 129.) Mr. Gomez testified that NPS employees make decisions about the placement of these barriers, based on events, accidents, or maintenance purposes. (Tr. 130.) Most importantly, the parties have stipulated that signage and other safety designs of the park are a discretionary function of NPS, as provided under 16 U.S.C. §1, and as further stated in the applicable NPS Policies. (See Stip. Fact H.)

Based on the foregoing, the Government has amply demonstrated that NPS employee decisions in this case were discretionary. By contrast, Plaintiff failed to present any evidence to show that there are mandatory statutes or policies that govern the NPS employees' conduct.

        ii.     Step Two: The Conduct is Susceptible to Policy Analysis.

Next, Plaintiff must show that the challenged conduct was not grounded in policy considerations. The issue is not whether the NPS employees' decision was "correct," but whether the decision was susceptible to policy analysis. See Brotman v. United States, 111 F. Sup. 2d 418, 425 (S.D.N.Y. 2000).

P-049

In this case, the decision of whether and how to position the barricades were left to NPS maintenance workers who "must work within the limits of funding and staffing." NPS Policies § 8.2.5.1. NPS recognizes "that there are limitations on its capability to totally eliminate all hazards... [but will] remove known hazards and apply appropriate measures... that have the least impact on park resources and values." Id. Officer Gomez testified that the barricades were: orange, interconnected, contained "Do Not Enter" signs, and were visible from 200 feet away at night. (Tr. 125-126, 128, 133.) Balancing the manner in which the runway was closed with the cost is precisely the type of policy analysis contemplated in Gaubert. See Gaubert, 499 U.S. at 324.

"Indeed numerous courts interpreting similar guidelines have found that the discretionary function exception bars an action under the FTCA for injuries suffered by patrons of NPS facilities based on allegations of deficient safety precautions." Brown, 661 F. Supp. 2d at 364 (citing Rosebush v. United States, 119 F.3d 438, 442 (6th Cir. 1997) ("relying on the discretionary function exception to bar suit where toddler fell into a fire pit on a campground, noting that in the absence of regulations, statutes or administrative policies mandating the 'specific manner' in which campsites were to be maintained, the decisions of the Forest Service as to such maintenance 'would clearly fall with the discretionary function exemption'"); and Brotman, 111 F. Supp. 2d at 418 ("barring claims of injury due to improper lighting and failure to warn in Statue of Liberty where policy merely stated that 'all prudent

12

measures shall be taken to protect the safety of the public' but did not prescribe any particular safety measure.")).

By contrast, Plaintiff fails to cite authority to show that the decisions of NPS staff were not subject to policy analysis. In fact, at least one case cited by the Plaintiff, Tippett v. United States, 108 F. 3d 1194, 1199 (10th Cir. 1997), undermines Plaintiff's position. In Tippett, the Tenth Circuit held that the discretionary function exception applied when a park ranger directed a snowmobiler to follow a particular course, and as a result sustained injuries from charging moose. The court held that the park ranger's decision required balancing the conservation of wildlife with the interest of public access; a discretionary decision susceptible to policy analysis. Id. at 1199.

Likewise, the Court in a Sixth Circuit case cited by Plaintiff, the only case involving signage on a roadway, affirmed the District Court's dismissal for lack of subject matter jurisdiction, holding that, "[A]ny object markers and warning devices on the railings and abutment [of the road] fall within the discretionary judgment of the [U.S. Army Corps of Engineers], and decisions regarding placement of warnings are protected by the discretionary function exception of the FTCA. Any duty to warn of this open and obvious hazard is discretionary and exempt from an action in tort." Rich v. United States, 119 F.3d 447, 452 (6th Cir. 1997). In particular, the Sixth Circuit noted that the drivers were, in general, familiar with this road and warnings

would likely have no more protective effect than the open and obvious condition of the road itself. Id.

Likewise, here, Plaintiff was aware that he was riding in the park after dark, in an area that was off-limits to motor vehicles. (Tr. 56, 57, 109, 127-128.) He also knew that the park uses orange barricades to cordon off restricted areas. (Tr. 59, 60.) Plaintiff's suit is exempt from any action in tort, first because decisions regarding the barricades were discretionary, and second, because the condition was open and obvious, as further discussed below.

Because Plaintiff has not alleged any facts or pointed to any authority that "support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime," Plaintiff fails to meet his burden. Gaubert, 499 U.S. at 324-325.

For the foregoing reasons, the court must dismiss the action for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(h)(3).

II. The Orange Barriers Are Not a Dangerous Condition.

Even assuming arguendo the court had jurisdiction, the Government is still not liable for Plaintiff's injuries. There is no duty to warn for a condition that is open and obvious and, "as a matter, of law, not inherently dangerous; under such circumstances, the condition is a warning itself." See Glassberg v Staples the Off. Superstore E., Inc., 08-CV-2132 (KAM) (JMA), 2010 WL 3924682, at *1 (EDNY

14

Sept. 13, 2010), report and recommendation adopted, 08-CV-2132, 2010 WL 3909206 (EDNY Sept. 29, 2010); see also Tagle v. Jakob, 97 N.Y. 2d 165, 169 (2001); Espinoza v. Hemar Supermarket, Inc., 43 A.D. 3d 855, 855 (N.Y. App. Div. 2007); Cupo v. Karfunkel, 1 A.D.3d 48 (N.Y. App. Div. 2003).

Whether Plaintiff observed the condition prior to [colliding with] it is immaterial to the question of whether the condition was open and obvious. Glassberg, WL 3924682 at 5 (citing Gibbons v. Lido, Point Lookout Fire Dist., 293 A.D. 2d 646, 647 (2d Dep't 2002) (holding that plaintiff's failure to see an open and obvious cement block on the floor of a well-lit firehouse before she tripped over it did not preclude the court from finding that the block was open and obvious as a matter of law); Chranky v. Marshalls, Inc., 273 A.D. 2d 266, 266 (2d Dep't 2000) (holding that a shopper's failure to observe a stationary clothing rack before tripping over it was not material to whether the court may find as a matter of law that it was open and obvious)).

Here, Plaintiff and his friend were familiar with these barriers, which they rode past, coming from the Amelia Earhart Campground going to Raptor Point. (Tr. 36, 37, 106-108, 109; Gov. Ex. N.) They rode past the barriers again, riding from Raptor Point to the Remote Control Flying Field. (Tr. 37, 38, 106-108, 109; Gov. Ex. N.) In addition, Plaintiff had previously observed orange barriers cordoning off areas during park events and deterring motorists from passing through prohibited areas. (Tr. 50, 59, 109, 130.) Notably, the orange barriers at issue were labeled with "Do

Not Enter" signs and visible from 200 feet at night, and were, therefore, an open and obvious condition. (Tr. 125-126, 127-128, 133.)

## **CONCLUSION**

For the foregoing reasons, the Government is not liable for Plaintiff's injuries and the case is dismissed with prejudice for lack of subject matter jurisdiction.

SO ORDERED.

Dated: January 10 2017
       Brooklyn, NY

/s/ USDJ STERLING JOHNSON, JR.
_____
Sterling Johnson, Jr., Senior U.S.D.J.